Docket No. 100162.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

FIRST MIDWEST BANK, N.A., Appellant, v. STEWART TITLE
GUARANTY COMPANY, Appellee.

*Opinion filed January 20, 2006.*

JUSTICE McMORROW delivered the judgment of the court,
with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Kilbride,
Garman, and Karmeier concurred in the judgment and opinion.

## OPINION

In this appeal we are asked to decide whether the plaintiff, First
Midwest Bank (First Midwest), may recover economic losses from
defendant, Stewart Title Guaranty Company (Stewart Title), in a suit
for negligent misrepresentation based on Stewart Title's issuance of a
title commitment and policy of title insurance. The circuit court of
Cook County held that First Midwest could not state a cause of action
for negligent misrepresentation against Stewart Title and granted
Stewart Title's section 2–615 motion to dismiss with prejudice. The
appellate court affirmed that ruling. 355 Ill. App. 3d 546. We granted
First Midwest's petition for leave to appeal (177 Ill. 2d R. 315) and
now affirm the judgment of the appellate court.

## BACKGROUND

The facts of this case are not in dispute. In July 1995, John and Glenda Bergeron made an offer to purchase certain residential property in Green Oaks, Illinois, with the intention that the property would be used for their residence, but also as the home office of their architectural and interior design business, Downeast Design Group, Inc. (DDG). The Bergerons then applied to First Midwest for a $300,000 loan toward the purchase of the property, making First Midwest aware of the property's planned use.

In conjunction with the real estate transaction, a commitment for title insurance was obtained from Stewart Title, through its agent, Clear Title, Inc. (Clear Title). Stewart Title issued the title commitment on August 24, 1995, naming the Bergerons and First Midwest as the proposed insureds. Pursuant to this commitment, Stewart Title agreed that, upon receipt of certain fees and premiums, it would provide a policy of title insurance to the Bergerons in the amount of $425,000 and a lender's policy of title insurance to First Midwest in the amount of $300,000. The commitment also provided that both policies would contain "our comprehensive endorsement number 1 (without exceptions)." After receiving a copy of the title commitment, First Midwest's loan committee approved the $300,000 loan to the Bergerons.

The closing on the real estate transaction took place on October 5, 1995, at which time the Bergerons executed a $300,000 promissory note to First Midwest and a $300,000 mortgage to First Midwest Mortgage Corporation. Subsequently, Stewart Title issued the title insurance policies as promised. Neither the title commitment, nor the policies of title insurance, indicated that there were any restrictive covenants recorded against the property.

In July 1996, the Bergerons applied for and obtained an additional $300,000 loan from First Midwest. These funds were to be used for the construction of a free-standing garage/office space on the property, adjacent to the residence. In connection with this loan, First Midwest secured from Intercounty National Title Insurance Company (Intercounty Title), through its agent, Clear Title, Inc., a second title commitment and policy of title insurance in the amount of $300,000.

In January 1997, the Bergerons obtained a building permit from the Village of Green Oaks and, thereafter, construction began on the garage/office structure. A need for additional funds arose and the

Bergerons applied, once again, to First Midwest. Upon the request for additional funds, First Midwest approved a $752,000 "wraparound loan" to the Bergerons in May 1997. This loan consolidated and replaced the $300,000 acquisition loan and the $300,000 construction loan, as well as provided the additional funds to the Bergerons and DDG. In connection with this wraparound loan, First Midwest secured a new title commitment from Intercounty Title in the amount of $752,000. This title commitment contained no exclusions concerning a restrictive covenant affecting the property.

As part of the process of procuring the $752,000 wraparound loan, the Bergerons executed a disbursement request and authorization, instructing First Midwest to disburse $296,853.28 to First Midwest Mortgage Corporation to pay off the acquisition loan. As a result, on June 13, 1997, First Midwest sent a check in the amount of $296,853.28 to First Midwest Mortgage Corporation and on July 2,1997, First Midwest Mortgage Corporation notified the Bergerons that the $300,000 acquisition loan had been paid in full and the mortgage had been released.

In October 1997, the Bergerons and First Midwest received their policies of title insurance from Intercounty Title in connection with the wraparound loan. Apparently, through these policies, the Bergerons and First Midwest learned, for the first time, that the Bergerons' property was encumbered by a restrictive covenant that had been recorded against the land in 1945. This restrictive covenant provides that no part of the property may be used for business or commercial purposes. Because the Bergerons could not use their property as they had intended, they defaulted on their loan to First Midwest.[1] First Midwest foreclosed on the property, but was unable

---

[1]We note here that the restrictive covenant was not the only reason the Bergerons were prevented from using their property for their business. The size of the building constructed on the property and its use as office space also violated Village of Green Oaks zoning ordinances. The Bergerons attempted to have the zoning ordinances amended but were unsuccessful. Thereafter, the Village sued the Bergerons to have the newly constructed garage/office structure removed. The Bergerons were able to reach a settlement with the Village which allowed them to keep the structure as long as they agreed not to operate their business on the premises. In 1998, the Bergerons filed suit against Stewart Title and Clear Title, as well as the previous property owners and others who had been involved in the initial

to recoup the full value of its $752,000 wraparound loan to the Bergerons.

In May 1999, First Midwest filed a three-count complaint against Stewart Title and Clear Title, alleging that it would not have loaned money to the Bergerons had it known of the restrictive covenant against the property. In count I of the complaint, First Midwest brought a declaratory judgement action seeking to hold Stewart Title liable on the policy of title insurance. First Midwest also alleged negligent misrepresentation and fraudulent misrepresentation in counts II and III, respectively.

In a second amended complaint, First Midwest added Intercounty Title as a defendant. Subsequently, however, both Clear Title and Intercounty Title declared bankruptcy. For this reason, Clear Title and Intercounty Title are no longer parties to the proceedings.

Stewart Title moved for the dismissal of First Midwest's second amended complaint against it. In this motion, dismissal of counts II and III was sought pursuant to section 2–615 of the Code of Civil Procedure (735 ILCS 5/2–615 (West 1998)). With regard to count II, Stewart Title argued that the allegations in the complaint were legally insufficient to set forth a claim for negligent misrepresentation because: (1) First Midwest did not allege, nor could it show, that Stewart Title made any false statements in the title commitment upon which First Midwest reasonably relied; and (2) Stewart Title is not in the business of supplying information for the guidance of others in their business transactions and, therefore, cannot be sued in tort pursuant to the *Moorman* doctrine. See *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982) (no recovery in negligence for purely economic losses). With regard to count III, Stewart Title argued that First Midwest failed to state a legally valid claim for fraudulent misrepresentation because First Midwest did not allege, nor could it show, that Stewart Title knew its title search was incorrect.

The circuit court of Cook County entered an order on March 3, 2000, granting Stewart Title's motion to dismiss counts II and III with

---

sale of the property.

prejudice. The court did not state its reasons for granting this relief.

Subsequently, on January 23, 2003, Stewart Title moved for summary judgment on count I of First Midwest's second amended complaint. In this motion, Stewart Title argued that no action could be brought against it based on the policy of title insurance because the note and mortgage, which was secured by the lender's policy of title insurance issued by Stewart Title, had been paid off in June 1997. The title insurance policy, by its own terms, provided that payment of the insured mortgage terminated the policy of title insurance. Thus, Stewart Title argued, it could not be held liable on the policy.

On June 13, 2003, the circuit court granted Stewart Title summary judgment in its favor on count I of First Midwest's second amended complaint. First Midwest moved for reconsideration, but that motion was denied. The June 13, 2003, and March 3, 2000, orders became final and appealable on September 22, 2003. First Midwest filed a notice of appeal from these orders on October 21, 2003.

In the appellate court, First Midwest appealed the trial court's grant of summary judgment to Stewart Title and the dismissal with prejudice of count II.[2] First Midwest argued that the refinancing of the $300,000 acquisition loan did not terminate Stewart Title's liability under the policy because the original indebtedness was never extinguished but, rather, was incorporated into the new "wraparound" loan. First Midwest also argued that a cause of action for negligent misrepresentation had been stated because a title company, like Stewart Title in this case, is in the business of providing information when it issues a title commitment which fails to disclose encumbrances to title.

The appellate court affirmed the orders of the trial court. 355 Ill. App. 3d 546. Two justices upheld the dismissal of count II based on a finding that Stewart Title was not in the business of supplying information when it issued the title commitment to First Midwest.

---

[2]First Midwest did not appeal the dismissal of the fraudulent misrepresentation claim.

355 Ill. App. 3d at 562. The third justice, Justice Quinn, specially concurred, agreeing that count II was properly dismissed, but for different reasons. Justice Quinn believed that a title company *is* in the business of supplying information when it issues a title commitment and that the majority's holding to the contrary was unnecessary *dicta* because, in the case at bar, First Midwest could not maintain a negligent misrepresentation action against Stewart Title due to the fact that the title commitment and insurance policy had terminated. 355 Ill. App. 3d at 563-64 (Quinn, J., specially concurring in part & dissenting in part).

First Midwest filed a petition for leave to appeal, which we granted. We also permitted the American Land Title Association (ALTA) to file an *amicus curiae* brief in support of Stewart Title.

## ANALYSIS

Initially, we note that First Midwest has abandoned its claim with regard to count I. In this court, First Midwest does not challenge the appellate court's ruling that summary judgment was properly granted to Stewart Title because the release of the mortgage terminated Stewart Title's liability under the policy of title insurance. The only question before us in this appeal is whether First Midwest's claim against Stewart Title for negligent misrepresentation, set forth in count II of the second amended complaint, was properly dismissed pursuant to section 2–615 of the Code of Civil Procedure.

When a claim has been dismissed for failure to state a cause of action pursuant to section 2–615 of the Code, the critical inquiry on review is "whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted." *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81 (2004); *Jarvis v. South Oak Dodge, Inc.*, 201 Ill. 2d 81, 86 (2002). Thus, the issue before us is one of law and our review is *de novo*. *Vitro*, 209 Ill. 2d at 81.

### Negligent Misrepresentation

To state a claim for negligent misrepresentation, a plaintiff must allege: (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action

by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information. *Board of Education of the City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 452 (1989). See also *Fox Associates, Inc. v. Robert Half International, Inc.*, 334 Ill. App. 3d 90, 94 (2002); *Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*, 295 Ill. App. 3d 567, 572-74 (1998). Where, as here, purely economic damages are sought, this court has imposed a duty on a party to avoid negligently conveying false information only if the party is in the business of supplying information for the guidance of others in their business transactions. *Brogan v. Mitchell International, Inc.*, 181 Ill. 2d 178, 183-84 (1998)*; Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 89 (1982).

In the case at bar, First Midwest alleged in its second amended complaint that Stewart Title was in the business of supplying information for the guidance of others when it issued its title commitment and policy of insurance and, accordingly, had a duty to provide accurate information. First Midwest further alleged that, due to Stewart Title's carelessness or negligence, it "failed to include in either the title commitment or the title insurance policy, the existence of restrictive covenants which encumbered title to" the Bergerons' property and that First Midwest, having relied upon the title commitment, was induced to act and, as a result, suffered economic losses in the amount of $1 million.

First Midwest contends that all of the necessary elements of a negligent misrepresentation claim are set forth in count II of its second amended complaint and that the appellate court erred when it affirmed the dismissal of the complaint based on its finding that Stewart Title was not in the business of supplying information when it issued its title commitment. According to First Midwest, when a title insurance company issues a title commitment it is a "pure information provider," like a real estate broker or appraiser (see *Duhl v. Nash Realty Inc.*, 102 Ill. App. 3d 483 (1981)), a surveyor (*Rozny v. Marnul*, 43 Ill. 2d 54 (1969)), or a home inspector (*Perschall v. Raney*, 137 Ill. App. 3d 978 (1985)). Thus, when a title insurance company, such as Stewart Title in this case, fails to conduct a proper title search and provides inaccurate information concerning the condition or marketability of title regarding property for which a title

commitment is being issued, it may be held liable in tort for negligent misrepresentation. Thus, in the case at bar, First Midwest argues that it should be allowed to maintain a negligent misrepresentation action against Stewart Title to recover its economic losses as an exception to the *Moorman* doctrine. In support of this position, First Midwest relies heavily on *Notaro Homes, Inc. v. Chicago Title Insurance Co.*, 309 Ill. App. 3d 246, 257 (1999).

Stewart Title, to the contrary, agrees with the appellate court in the case at bar that a title company, when providing a title commitment, is *not* in the business of supplying information for the guidance of others. Stewart Title contends, therefore, that the exception to the *Moorman* doctrine does not apply and First Midwest's negligent misrepresentation claim was properly dismissed because it had no duty to list all of the defects, liens and encumbrances affecting the property.

Stewart Title also argues that First Midwest failed to allege sufficient facts in support of the "false statement" and "reasonable reliance" elements of a negligent misrepresentation cause of action. See *Grund v. Donegan*, 298 Ill. App. 3d 1034, 1037 (1998) (to avoid dismissal plaintiff must allege sufficient facts in support of each element of a cause of action). However, upon closer examination of these arguments, we find that they are contingent upon Stewart Title's claim that it had no duty, contractual or otherwise, to include in its title commitment a listing of all defects, liens, and encumbrances affecting the Bergerons' land. We conclude, therefore, that the threshold issue to be resolved in the case at bar is whether First Midwest sufficiently alleged that Stewart Title had a duty to convey accurate information, arising from the fact that, when it issued its title commitment, it was in the business of supplying information for the guidance of others in their business transactions. We now address this issue.


The Economic Loss Doctrine

In *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982), we observed that, at common law, purely economic loss was generally not recoverable in tort and that this "economic loss rule" prevailed in most jurisdictions throughout the United States. We concluded that "contract law, which protects expectation interests,

provides the proper standard when a qualitative defect is involved." *Moorman*, 91 Ill. 2d at 81. Accordingly, we held that a party "cannot recover for solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation." *Moorman*, 91 Ill. 2d at 91.

We recognized three exceptions to this general rule: (1) where the plaintiff sustained damage, *i.e.*, personal injury or property damage, resulting from a sudden or dangerous occurrence (*Moorman*, 91 Ill. 2d at 86); (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.*, fraud (*Moorman*, 91 Ill. 2d at 88-89); and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions (see *Moorman*, 91 Ill. 2d at 89). See *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 199 (1997). When setting forth the third exception for negligent misrepresentation claims, we cited *Rozny v. Marnul*, 43 Ill. 2d 54 (1969), wherein we held that the plaintiffs could recover in tort for their economic losses proximately caused by their reliance on a plat of survey, which carried an "absolute guarantee" and which contained inaccurate information.

Since *Moorman,* the proper application of the negligent misrepresentation exception has been discussed by this court on several occasions. In *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill. 2d 146 (1986), the plaintiff contracted with a third party to install certain electrical units that were manufactured by defendant. Plaintiff improperly installed the units and was required to redo much of its work. Plaintiff sought recovery of its economic losses from defendant based on defendant's alleged negligent performance of a service, *i.e.*, defendant's failure to supervise and inspect the installation process. Defendant had a contract with the third party to perform these services, but plaintiff had no direct contractual relationship with defendant. We applied *Moorman* to preclude the plaintiff from recovering in tort, even though plaintiff was unable to recover from defendant in contract. *Anderson Electric*, 115 Ill. 2d at 153. We also rejected plaintiff's attempt to bring its negligence claim within the negligent misrepresentation exception, stating "it simply cannot be said [that defendant] was in the business of supplying information for the guidance of others in business transactions and had made negligent misrepresentations." *Anderson*

*Electric*, 115 Ill. 2d at 154.

Thereafter, in *2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill. 2d 3d 302 (1990), we again employed the economic loss doctrine, this time to deny a tort claim for architectural malpractice. The plaintiff in *2314 Lincoln Park West* had argued that "an architect supplies information to be used by others" and, therefore, the malpractice claim fell within the misrepresentation exception to the *Moorman* rule. *2314 Lincoln Park West*, 136 Ill. 2d at 313. In rejecting this claim, we held that "while it may be the case that an architect does in fact supply information relied on by others, we do not believe that the character of that function should be overstated." *2314 Lincoln Park West*, 136 Ill. 2d at 313. Explaining further, we held that "the economic loss rule attempts to define the contours of duty" (*2314 Lincoln Park West*,136 Ill. 2d at 315), and since an architect's responsibilities are defined by contract, its duty "should be measured accordingly" (*2314 Lincoln Park West*, 136 Ill. 2d at 317).

Subsequently, in *Fireman's Fund Insurance Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160, 168 (1997), we addressed the negligent misrepresentation exception to the *Moorman* doctrine directly, explaining that the focus must be on whether the defendant is in the business of supplying *information* as opposed to providing something tangible. *Fireman's Fund Insurance Co.*, 176 Ill. 2d at 169. We concluded that when the negligent misrepresentation is contained within information which is incidental to a tangible product, such as an architect's drawings or, as in that case, plans for a water supply system, the accuracy of such information can be memorialized in contract terms and, thus, the *Moorman* negligent misrepresentation exception to the economic loss doctrine does not apply. *Fireman's Fund Insurance Co.*, 176 Ill. 2d at 169; see also *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 308 Ill. App. 3d 18, 28 (1999). In short, the negligent misrepresentation exception to the *Moorman* doctrine is not applicable if the information supplied is merely ancillary to the sale of a product. *Fireman's Fund Insurance Co.*, 176 Ill. 2d at 168.

In the case at bar, we must decide the nature of a title commitment, for it is the nature of the title commitment that will define the parameters of the title insurer's duty. If, as First Midwest contends, a title insurer, when it issues a title commitment, undertakes a duty to perform a title search and to provide the results

of that title search for the guidance of others in their business transactions, then it would be appropriate to find that First Midwest could recover its losses resulting from its reliance upon representations made within the title commitment. Under these circumstances, the negligent misrepresentation exception to the *Moorman* economic loss rule would apply. If, however, the title commitment is, as Stewart Title argues, simply an offer to provide a policy of title insurance in accordance with the terms stated in the commitment, then the negligent misrepresentation exception would not apply.

ALTA, in the *amicus* brief submitted to this court, offers us some necessary insight into the nature of a title commitment in Illinois. As ALTA explains, First Midwest is treating a title commitment like an abstract of title, which is categorically different from a title commitment. According to ALTA, when an abstract of title is requested for a property, the abstracter examines the record and makes a summary of title, disclosing all defects, liens and encumbrances affecting that property. The sole purpose of an abstract of title is to provide information regarding the title. Thus, in this instance, the failure to provide accurate information would be actionable in tort.

ALTA further explains, however, that it is not the purpose of a title commitment to provide a listing of all defects, liens and encumbrances affecting the property. A title commitment is simply a promise to insure a particular state of title. To the extent that the title commitment contains information concerning the title, such information is provided to give notice of the limitations to the risk that the title insurer is willing to insure. See also 1 Am. Jur. 2d *Abstracts of Title* §2 (2005); 1 M. Keller, *Title Insurance and Other Title Evidence*, in Basic Real Estate Practice (Ill. Inst. for Cont. Legal Educ. 1995).

We have reviewed the record and studied the title commitment which Stewart Title issued. We agree that the title commitment does not contain, nor does it purport to contain, a listing of all defects, liens, and encumbrances affecting title to the property at issue here. Schedule B of the title commitment states: "Schedule B of this policy or policies to be issued will contain the exceptions shown on inside cover of this Commitment and the following exceptions, unless same are disposed of to the satisfaction of the Company." It then lists

certain encumbrances which would not be covered if a policy of title insurance were to issue without further action. Nowhere does the commitment contain any guarantee concerning the performance of a title search. In fact, such a guarantee would be counterintuitive since the purpose of the title commitment is to set forth the terms for issuing a policy of title insurance and the purpose of the policy of title insurance is to insure against the risk of undiscovered defects, liens, and encumbrances.

We conclude, therefore, that a title insurer is not in the business of supplying information when it issues a title commitment or a policy of title insurance and, accordingly, the negligent misrepresentation exception to the *Moorman* doctrine does not apply. The scope of a title insurer's liability is properly defined by contract.

We realize that our conclusion here conflicts with the appellate court's ruling in *Notaro Homes, Inc. v. Chicago Title Insurance Co.*, 309 Ill. App. 3d 246 (1999). In *Notaro*, the court held, without any analysis, that when a title insurer issues a commitment it is in the business of supplying information for the guidance of others. As we have explained, this premise is incorrect. Thus, to the extent that *Notaro* relied on this incorrect premise in reaching its determinations, we overrule *Notaro*.

Having decided that, in the case at bar, Stewart Title was not in the business of supplying information when it issued its title commitment to First Midwest Bank, we affirm the appellate court's ruling that First Midwest's claim for negligent misrepresentation was properly dismissed pursuant to section 2‒615 of the Code of Civil Procedure. For this reason, we need not reach any of the additional matters asserted in support the appellate court's judgment.

## CONCLUSION

In the case at bar, First Midwest Bank failed to state a cause of action against Stewart Title for negligent misrepresentation. We affirm the judgment of the appellate court, upholding the dismissal with prejudice of count II of plaintiff's second amended complaint.

*Appellate court judgment affirmed.*

˘12˘